<pre>
 1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2     _____

 3     United States of America,      ) Criminal Action
                                      ) No. 1:23-mj-00153-RMM
 4                      Plaintiff,    )
                                      ) Detention Hearing
 5     vs.                            )
                                      )
 6     Sai Varshith Kandula,          ) Washington, D.C.
                                      ) June 9, 2023
 7                      Defendant.    ) Time:  1:38 p.m.
       _____

 8
                  Transcript of Detention Hearing
 9                         Held Before
              The Honorable Moxila A. Upadhyaya
10              United States Magistrate Judge

11     _____

                      A P P E A R A N C E S
12
       For the Plaintiff:      Alexander Schneider
13                             Shehzad Akhtar
                               UNITED STATES ATTORNEY'S OFFICE
14                             FOR THE DISTRICT OF COLUMBIA
                               601 D Street, Northwest
15                             Washington, D.C. 20579

16     For the Defendant:      Diane A. Shrewsbury
                               Edward Smock
17                             FEDERAL PUBLIC DEFENDER FOR THE
                               DISTRICT OF COLUMBIA
18                             625 Indiana Avenue, Northwest
                               Washington, D.C. 20004
19
       Also Present:           Christine Schuck, Pretrial Services
20                             Officer

21     Proceedings reported by FTR Gold Electronic Recording Software.
       _____
22
       Transcribing Stenographic Court Reporter:
23                             Nancy J. Meyer
                               Registered Diplomate Reporter
24                             Certified Realtime Reporter
                               333 Constitution Avenue, Northwest
25                             Washington, D.C. 20001
                               202-354-3118
</pre>

<u>P R O C E E D I N G S</u>

1

2 THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

3 This is Magistrate Case No. 23-153, the United States of

4 America v. Sai Kandula.  The defendant is present in the

5 courtroom.  This matter is set for a detention hearing.

6 Parties, please introduce yourselves for the record,

7 starting with the government.

8 MR. SCHNEIDER:  Good afternoon, Your Honor.

9 Alexander Schneider for the United States, and I'm joined by

10 Shehzad Akhtar.

11 THE COURT:  Good afternoon, Mr. Schneider.  Good

12 afternoon, Mr. Akhtar.

13 MS. SHREWSBURY:  Good afternoon, Your Honor.  Diane

14 Shrewsbury, joined by Ned Smock, on behalf of Mr. Kandula,

15 who's present in the courtroom.

16 THE COURT:  Good afternoon, Ms. Shrewsbury.  Good

17 afternoon, Counsel.  And good afternoon, Mr. Kandula.

18 THE PRETRIAL SERVICES OFFICER:  And Christine Schuck

19 with pretrial services.

20 THE COURT:  Good afternoon, Ms. Schuck.

21 Okay.  We have this set for a detention hearing, and I

22 have reviewed the papers.  I have a number of questions, but I

23 will allow -- unless there are any preliminary matters, I will

24 allow the government to make its presentation.

25 I will say, just for a moment, though, I believe that

1    there was a request -- and I'll just state -- state this in

2    open court.  There was a request for one participant to be in

3    the hearing by Zoom.  Have we arranged for that?

4         Okay.  So is there a proposed -- my -- Ms. Shrewsbury,

5    my understanding is that there is a proposed third-party

6    custodian, who is Mr. Kandula's mother, who has requested to

7    appear by Zoom; is that correct?

8              MS. SHREWSBURY:  A backup.  But, yes, that's correct.

9              THE COURT:  A backup.  Okay.  And that is because she

10   is not in this jurisdiction and has obligations to

11   Mr. Kandula's sibling?

12             MS. SHREWSBURY:  Yes.

13             THE COURT:  Okay.  So I have granted that request.

14   So just for -- for everyone in the court -- purposes, we do

15   have one individual participating by Zoom, and that's someone

16   who is being proposed as a backup third-party custodian.

17        Okay.  Mr. Schneider.

18             MR. SCHNEIDER:  Your Honor, I believe the parties

19   would like to approach.

20             THE COURT:  Okay.

21             (Bench conference on the record.)

22             (REPORTER'S NOTE:  The court reporter could not hear

23   clearly or distinctly any audio on the FTR during the bench

24   conference.  The court reporter asked IT to check into the

25   issue, which they did.  The boundary microphone that is used

1   for bench conferences was located on the side of the bench;

2   therefore, no voices were captured clearly and distinctly.)









23          (Proceedings held in open court.)

24          THE COURT:  Okay.  There is one matter that I need to

25   handle in a sealed session.  And so I'm going to ask that

1   anyone that is not a party to the case or court personnel or an

2   agent clear the courtroom, and so -- just -- just a moment.

3         (Off the record.)

4                 **\*\*\*\*\* SEALED \*\*\*\*\***











1 ██████████████████████████████████████████████

2 ████████████████████████████████████████

3          ████████████████████████

4          █████████████████████████

5          ████████████████████████████████

6 ██████████████████████

7          (Proceedings held in open court.)

8          THE COURT:  I'll just note for the -- for the

9 recording that we are now beginning the unsealed portion of the

10 detention hearing.  We are ending the sealed portion of the

11 detention hearing.

12          Okay.  Do we have Mr. -- Mr. Kandula's -- okay.  Okay.

13 Well, there were others -- are there -- no, they're allowed to

14 come in now.  You can come in.

15          Okay.  Okay.  Mr. Schneider, I'll hear from you first.

16          MR. SCHNEIDER:  Thank you, Your Honor.

17          First, just -- the government wants to highlight that

18 this case involves a presumption of detention.  It involves

19 the application of 18 United States Code § 2332b, which defines

20 an act of terrorism as an offense that is calculated to

21 influence or affect the conduct of government by

22 intimidation --

23          THE COURT:  Do I have to find that the facts in this

24 case satisfy the subsection (a) of the 22- -- it's just -- it's

25 just by sheer virtue of the fact that this is a listed

1   offense -- 18 U.S.C. 1361 is a listed offense and

2   subsection (b) of that statute triggers the presumption; is

3   that correct?

4          MR. SCHNEIDER:  Yes, Your Honor.  That is correct.

5          THE COURT:  Okay.  So then I've -- I was curious as

6   to why you were making the argument as to subsection (a).

7          MR. SCHNEIDER:  Your Honor, I think it's important to

8   rebut what the defense raises in their filing; that the

9   guideline in this case -- acknowledging that sentencing is far

10  away -- would be low because the guideline in this case would

11  include the terrorism enhancement, which by operation of the

12  guideline makes this case a -- an Offense Level 34 with a

13  Criminal History Category VI.

14      So that provides an incentive to flee.  It increases the

15  likelihood that the defendant will not appear for court, or

16  absconds and condition -- in combination with the other

17  factors, including his status as a non-U.S. citizen.  He's here

18  lawfully as a Green Card holder, but all those --

19          THE COURT:  Unlawfully, did you say?

20          MR. SCHNEIDER:  He's here lawfully, Your Honor.

21          THE COURT:  Right.  Exactly.

22          MR. SCHNEIDER:  Right.  But, Your Honor, the fact

23  that he has -- the fact that he potentially faces deportation

24  is a factor to consider for risk of flight.

25      Your Honor -- Your Honor, I'll turn to just the nature

1    and circumstances of this offense.

2            THE COURT:  I don't need to find this qualifies as a

3    crime of violence and hold the hearing, or do I -- there seemed

4    to have been some confusion or at least some discussion before

5    Judge Meriweather as to whether that was the case.

6        So I just want to confirm that there's no dispute about

7    that any longer; is that right?

8            MR. SCHNEIDER:  Yes, Your Honor.  The government is

9    not relying on crime of violence --

10           THE COURT:  Okay.

11           MR. SCHNEIDER:  -- as a reason to hold the hearing or

12   for the presumption.

13           THE COURT:  Okay.  Case law is not as clear on that

14   one, so.

15           MR. SCHNEIDER:  That's correct, Your Honor.

16           THE COURT:  So it's a good -- good strategy on your

17   part.

18           MR. SCHNEIDER:  Your Honor, so I just want to

19   highlight some facts about this case.

20       The nature and circumstance, his stated intention in his

21   green book and his acts show that he -- what he intended to do

22   was to overthrow the government, replace it with a dictatorship

23   fueled by Nazi ideology.

24       It is not just his writings that contain that.  It's

25   also the fact that moments after the attack, he unfurled the

1    flag of Nazi Germany to kind of demonstrate where his mot- --

2    political motivation for this attack.  I'll also note that he

3    repeatedly asked officers on scene would this make the news,

4    indicating that he wanted to have -- have this attack or his

5    attempt to be wildly circulated.

6         This is not some fantasy written in a 19-year-old's

7    bedroom.  This is a fantasy that actually the person took major

8    steps to accomplish:  purchase of a plane ticket from

9    St. Louis; taking two flights here to Washington, D.C.; renting

10   a large-sized U-Haul that would increase the chance that he

11   could breach the barriers to the White House.

12        Your Honor, I want to focus on two facts of that.  One,

13   those flights and the time to drive from the Dulles airport to

14   the location of the attack provided an ample opportunity for

15   him to reflect on what he was about to do.  This was not an

16   impulsive act.  It was planned and premeditated.

17        It also shows that his parents are not suitable

18   third-party custodians in this case.  And it's the government's

19   position that based on the filings and the proffer of facts

20   that the Court does not need to consider them as third-party

21   custodians because even with them, if they were appropriate

22   third-party custodians, it's -- it's clear that he is a danger

23   to the community and a risk of flight.

24        His parents would have -- he lived with his parents

25   during this offense.  They had no knowledge, apparently, of his

1    intent to carry out this attack.  We believe that the first

2    time they knew about it is when they heard it on the news or

3    were informed by law enforcement.

4              THE COURT:  But, Mr. -- Mr. Schneider, at the time

5    that Mr. Kandula allegedly committed these acts, he was not a

6    minor.  And there are often circumstances when we are asked

7    to -- and in some cases do -- put strict conditions on a

8    defendant but place them back in the home where they were

9    living when they allegedly conducted or carried out their

10   criminal enterprise or criminal acts.

11         And so why wouldn't extremely, you know, strict

12   conditions mitigate any concern about dangerousness to the

13   community or to any other person besides any argument you may

14   have made in the sealed session?

15             MR. SCHNEIDER:  Your Honor, I'd say the fact that if

16   you look at -- we acknowledge the factual impossibility of this

17   attack being successful, but that desperation really highlights

18   the dangerousness.  There is -- the idea -- the motivation, the

19   ideology that spurred this attack, there is no evidence that

20   that's abated.

21         So if he's released to a third-party custodian, there is

22   nothing that would prevent him from leaving his residence.

23   Granted, he would be on a GPS monitor; so after the fact law

24   enforcement would know where he is until that GPS monitor died

25   and no longer broadcast a signal.  That is an -- insufficient

1    security given the fact that he -- this -- and this motivation

2    is so powerful for him to commit this offense that -- and that

3    hasn't been abated.

4            THE COURT:  But you're conceding that he could not

5    have -- you just said that it would have been impossible for

6    him to have carried -- carried out his plan.  I mean, I

7    question what the plan -- you know, what the plan was.  Was --

8    was the plan to -- as he allegedly stated, to get to the

9    White House, seize power, and be part -- be put in charge of

10   the nation?  Or do you mean that it would have been impossible

11   for him to go into the White House or get near the White House

12   and harm someone?

13           MR. SCHNEIDER:  No, Your Honor.

14           THE COURT:  Possibly the Executive.  I mean, that's

15   what I'm trying to understand.

16           MR. SCHNEIDER:  We're talking about the irrationality

17   of believing that you can be installed as a dictator.

18           THE COURT:  Okay.  All right.  Because it -- are you

19   conceding that he couldn't have caused serious harm had he

20   gotten -- gotten through the bollards?

21           MR. SCHNEIDER:  Absolutely not, Your Honor.

22           THE COURT:  Okay.

23           MR. SCHNEIDER:  In fact, when he nearly struck

24   the two pedestrians who were next to the bollards, he created

25   a very dangerous situation just in general for those two

1      people.

2                  THE COURT:  Well --

3                  MR. SCHNEIDER:  The attack only stopped because his

4      vehicle was disabled.

5                  THE COURT:  Okay.  Well, I've received stills

6      from that event.  Do you have a video to show me?  Because

7      it -- it was not as clear to the Court what the speed of the

8      truck was and where those pedestrians were.  Now, if

9      there's one -- there's one still where the pedestrians are

10     admittedly very close to the truck after Mr. Kandula allegedly

11     turned right into the bollards.  He's going eastbound on

12     H Street; correct?

13                 MR. SCHNEIDER:  Yes, Your Honor.

14                 THE COURT:  Okay.  He turns right into the bollards.

15     There's those two pedestrians near the bench.  But it's unclear

16     to me how fast he was going, whether they saw him and -- or

17     they don't -- from what I can tell, they don't -- it's just --

18     I can't -- I can't see from your submission the fleeing of

19     multiple pedestrians, as you allege, and how close he actually

20     came to hitting those pedestrians.  Although I -- I clearly see

21     that there were -- that it was a very potentially dangerous

22     situation.

23                 Do you have a video to show me?

24                 MR. SCHNEIDER:  Your Honor, we -- we can provide

25     that.  However, I -- I just want to proffer the fact that we're

1    not alleging that he intended -- there's no evidence that he

2    intended to strike those two pedestrians.

3              THE COURT:  No.  I'm -- I'm -- I'm concerned about

4    the behavior that led to the driving into -- onto a sidewalk,

5    onto the bollards.  We'll take the fact that it's right in

6    front of the White House separately.  But then there -- there

7    were pedestrians there.  All I'm saying is I couldn't

8    necessarily tell what -- how fast he was going and exactly, you

9    know, how much danger those individuals were in.  The stills

10   don't give me that information.  It would be nice to know.

11             MR. SCHNEIDER:  Yes, Your Honor.  What we would

12   propose is during the defense counsel argument, I can prepare

13   that video and I can display that to the Court.

14             THE COURT:  Okay.

15             MR. SCHNEIDER:  Your Honor, I also want to rebut some

16   of the statements in the defense -- or some of the arguments

17   made in the defense filing.

18             First, Your Honor, that this -- this case compared to

19   the January 6 case and the potential defendant's release.

20   First of all, the law requires each case to be evaluated on its

21   own.

22             But, secondly, this was an individual act, a lone wolf,

23   so to speak, which kind of highlights the dangerousness of it.

24             Your Honor, the government's position is that the weight

25   of the evidence, the dangerous- --

1          THE COURT:  Well, lone wolf acting alone is -- is

2     less dangerous than hundreds, potentially thousands of people

3     coming to the Capitol and committing an attempt to insurrect

4     the government --

5          MR. SCHNEIDER:  Your Honor --

6          THE COURT:  -- some armed?

7          MR. SCHNEIDER:  Your Honor, not in that term.

8          But the point is that an individual who harbors these

9     ideals, these Nazi-inspired ideals to commit this attack, can

10    be very dangerous because they're difficult to detect from a

11    law enforcement perspective.  So that's the point --

12         THE COURT:  I understand.

13         MR. SCHNEIDER:  -- that we're making.

14         THE COURT:  Okay.

15         MR. SCHNEIDER:  Your Honor, so it's the government's

16    position that there's no facts to rebut the presumption of

17    detention in this case and the parents are not suitable

18    third-party custodians.

19         Thank you.

20         THE COURT:  With respect to your argument about

21    serious risk of flight, the law seems not great, to be frank,

22    on the government's side.  I mean, just simply because someone

23    does -- is not a -- is not a citizen of the United States but

24    is a lawful permanent resident, explain to me exactly why you

25    believe given his ties to the community in -- you know, near

1    St. Louis and -- admittedly -- I see no ties to this

2    community -- but to the community in which he's being proposed

3    to be placed into -- you know, back -- back into -- what facts

4    do you have other than he's facing a serious prosecution and

5    that he's of Indian descent and has family members in India,

6    that he poses a serious risk of flight, which is the language

7    of the Bail Reform Act?

8            MR. SCHNEIDER:  Yes, Your Honor.  It's really a

9    combination of all those factors.  It's the combination of the

10   seriousness of the offense, the -- the potential sentence that

11   could be imposed in this case.  And it's not necessarily the

12   fact that he is of a particular descent.  It's the fact that

13   because of his immigration status, he has this potential for

14   deportation as a result of this case.

15           And it's not really necessarily, Your Honor, that he

16   would flee to India or any other country, but just that he

17   would abscond from this jurisdiction.

18           Also, again, just to -- the fact that he traveled,

19   really, from St. Louis to Washington, D.C., to carry out his

20   attack kind of demonstrates that he's able to, kind of, travel.

21   And there's -- even with a GPS monitor -- again, once that

22   monitor is no longer functioning because the battery died, he

23   can literally go anywhere in the United States.  There would be

24   no ability to detect where he was.  So all those --

25           THE COURT:  A GPS monitor would -- would mitigate

1   that, and listing him on the no-fly list would mitigate that.

2            MR. SCHNEIDER:  Yes, Your Honor, it does mitigate it.

3   But it doesn't remove the government's contention that he would

4   be a serious risk of flight.

5            THE COURT:  Okay.  How can he fly --

6            MR. SCHNEIDER:  Your Honor --

7            THE COURT:  -- domestically -- let me finish.

8        How can he fly domestically or internationally if he's

9   on the no-fly list --

10           MR. SCHNEIDER:  Your Honor --

11           THE COURT:  -- and you take away his -- well, he

12  doesn't have a -- he doesn't have a U.S. passport, I assume.

13           MR. SCHNEIDER:  Your Honor, I -- I don't know if he

14  has a U.S. passport.  He has an Indian passport that is -- is

15  in the possession of law enforcement.

16           THE COURT:  Okay.  So his passport, his Indian

17  passport -- I mean, I would assume he doesn't have a

18  U.S. passport because he's a lawful permanent resident, not a

19  citizen.  You -- you have his passport.  Put him on the no-fly

20  list --

21           MR. SCHNEIDER:  Your Honor --

22           THE COURT:  -- where he is -- where -- what -- what

23  facts are you relying on to make your argument that he poses a

24  serious risk of flight?

25           MR. SCHNEIDER:  Your Honor, we're not implying that

1   he could fly on the no-fly list, but there's other means of

2   transportation for him to abscond from proceedings in this

3   case.

4            THE COURT:  What are those means?

5            MR. SCHNEIDER:  Your Honor, he could use a vehicle.

6   He could take his parents' car and just drive away from the --

7   to flee the -- the case.  I know that's -- you know, we don't

8   have any specific facts that he intends to do that.  But if you

9   look at the charges in this case, the potential for

10  deportation, together, also with his ideology fueling -- the

11  unmitigated ideology fueling this attack, all those three

12  things together, the government concedes, are -- or contends

13  does provide a serious risk of flight.

14          We acknowledge in this case that the danger to the

15  community by clear and convincing evidence is a much stronger

16  basis for detention in this case, but we argue both,

17  Your Honor.

18          THE COURT:  Okay.  And -- and just following up on

19  the serious risk of flight argument that you-all have made,

20  there was a reference to family members in India.  That's why I

21  asked the question.  That's in your paper.

22          So you're saying that's not necessarily something you're

23  relying on now.  But is there some -- do you have anything

24  specific that would suggest that he would -- he would have a

25  plan to abscond to India, notwithstanding the fact that you

1   have his passport and he might -- he would be -- I could -- I

2   could fashion a condition where he's put on the no-fly list --

3   that he could go there?  That's why I'm asking about that

4   specific fact.

5            MR. SCHNEIDER:  Your Honor, I understand.  I guess

6   we'd say we do not have any evidence of the defendant's

7   specific intent to travel to India.  It's just a concern.

8        We understand that the no-fly list would mitigate that,

9   but there's -- there would be other ways for him to travel by

10  land to cross a border, to travel to India.  I acknowledge the

11  speculation of that, but it is a consideration for the Court to

12  make.

13           THE COURT:  Okay.  Just a moment, please.  He had a

14  one-way ticket, did he not?

15           MR. SCHNEIDER:  That's correct, Your Honor.

16           THE COURT:  Okay.  Do you know -- well, I'll ask

17  Ms. Shrewsbury the same question.

18       Do you know whether Mr. Kandula has a sibling?

19           MR. SCHNEIDER:  Your Honor, he does.

20           THE COURT:  And how old is this sibling?

21           MR. SCHNEIDER:  Your Honor, I don't -- I don't have

22  that information readily available.

23           THE COURT:  Okay.  I'll -- I'll ask Ms. Shrewsbury

24  that question.

25           Okay.  I -- I'd like to see the video.  So if you can

1     get that cued up for me.

2              MR. SCHNEIDER:  Yes, Your Honor.

3              THE COURT:  Thank you.

4        All right.  Ms. Shrewsbury.

5              MS. SHREWSBURY:  Thank you, Your Honor.

6        Mr. Kandula is a very young man, only 19 years old.

7     He's a recent high school graduate with no criminal history.

8     He's lived a very normal life up until this point and has a

9     loving family who continues to support him.  His father is here

10    today, and his mother is on the video.

11             To answer your question, he has a brother who, I

12    believe, is in high school, but I don't know his exact age.

13             THE COURT:  He's a minor?

14             MS. SHREWSBURY:  Yes.

15             You know, these -- the allegations here, this is very

16    aberrant behavior.  It's aberrant from his history and from

17    speaking with his parents for anything that would be expected.

18    It does not reflect who he is.  We're still, you know,

19    investigating, as it's early on in the case, and conferring

20    with an expert to try to figure out what causes a 19-year-old

21    person to be in this position.

22             He has no means to flee.  He has no -- doesn't have a

23    job.  He doesn't have funds.  The government has his passport.

24    And his parents are willing to serve as third-party custodians.

25    He's been living in the United States since he was about 10 or

1    11 and was here earlier as a much younger child.  So he doesn't

2    have, you know -- he's not a serious risk of flight with the

3    connections and things that would allow him to flee or cause

4    him to flee.

5           The allegations made and the threats that are being

6    discussed are very -- you know, some of the threats are very

7    far-fetched, and combined with the fact that he has no criminal

8    history that calls into the question the dangerousness to the

9    community --

10          THE COURT:  Ms. Shrewsbury, I mean, let's talk about

11   your -- well, you say it was an aberration.  There's -- the

12   government's proffer, which I'm entitled to rely on at this

13   time, is that he -- he -- I don't know how long -- if this

14   green book is, indeed, a book in which he wrote his thoughts,

15   his plans, his musings, his intentions, how long he'd been

16   keeping and -- and building on this green book, number one.

17   The government alleges that he's been planning this attack for

18   six months, and then he has to buy a ticket.

19          I'm very, very troubled by the fact that it's a one-way

20   ticket.  I don't know what that means.  But I can draw some

21   reasonable inferences from that fact that it was a one-way

22   ticket.  And I don't know what his plans were, if he were

23   successful, to reach anyone associated with the executive's

24   office, whether, you know, it's outside where the security is

25   or, you know, Secret Service agents.

1       But he had approximately six months of planning time, at

2   least according to the government's proffer.  Then he had to

3   purchase a ticket, flew, I guess -- it wasn't a direct flight,

4   at least that's what Mr. Schneider's saying.  Let's just assume

5   it's a direct flight for his benefit.  Two-hour --

6   two-and-a-half-hour flight from St. Louis to D.C.

7       Goes straight from Dulles -- doesn't stop anywhere, at

8   least according to what I've seen.  Goes to -- to rent a

9   U-Haul, has this Nazi propaganda in that U-Haul, and he has the

10   right under the First Amendment to think and hold beliefs that

11   he holds.  That's not the issue that I'm focusing on because he

12   has that right to think however he wants to think and associate

13   with whatever ideology he wishes to associate, as long as he

14   doesn't commit an attack or violence or threaten someone else's

15   property or person; but these steps that he took, going

16   straight to the -- get the U-Haul, and then driving straight to

17   the White House reflects to me that it's not necessarily an

18   aberration.

19       And then the statements I've heard about the -- the

20   statements that I've heard here in court, statements that he

21   both made to the officers after his arrest, as well as the

22   things we discussed before in sealed session, this doesn't --

23   I -- I want to know where that statement about he -- this being

24   an aberration is coming from.

25       Because to me all of these things reflect premeditation

1   and planning.  And my concern is if released, there's not going

2   to be anyone who can really control him enough to stop him from

3   carrying out any plans or thoughts that he has, intentions.

4        MS. SHREWSBURY:  Yes, Your Honor.  The point being

5   that he has no history of violence.  He has no prior record.

6   He has -- you know, there's no evidence that anything like this

7   has ever happened before; that this is -- this action is -- you

8   know, is different from the life that he has lived up until

9   this point and that -- you know, we're still investigating

10  what -- you know, what -- what might cause a different action

11  like that in a young person's life.

12        I would also point out that there was no --

13        THE COURT:  Do you concede that the -- speak to me

14  about the conduct of -- the conduct of Mr. Kandula on the night

15  of May 22nd.  I mean, if he was able to get through those

16  barriers, do you concede that he potentially posed a threat

17  there?

18        MS. SHREWSBURY:  He had no weapons with him.  He had

19  nothing with him, other than -- the -- the government has

20  proffered, it appears, a flag and a book.  You know, he -- he

21  also did not proceed past the barriers.

22        I believe you'll see in the video that the government is

23  going to present, he walks away from the barriers and stops and

24  takes out a flag and then waits to be -- moments until he's

25  stopped.  He doesn't resist.  He doesn't take any action.  He

1    doesn't attempt to flee.  He doesn't take any steps to move

2    beyond those barriers.

3              THE COURT:  And you've seen the video -- correct? --

4    before?

5              MS. SHREWSBURY:  Yes, Your Honor.

6              THE COURT:  I want to make sure you've seen it before

7    we show it.

8              MS. SHREWSBURY:  Yes, I have, Your Honor.

9              THE COURT:  Okay.  Okay.  Proceed, please.  Sorry.

10             MS. SHREWSBURY:  So we would just argue that there's

11   no means to flee.  There are opportunities to mitigate with

12   various conditions:  third-party custodian, GPS, the no-fly

13   list that Your Honor mentioned.  You know, we're concerned

14   that his health and well-being at the D.C. Jail, he can't get

15   the services that he needs.

16        He recently was sent to the hospital at -- I learned

17   this morning, for dehydration and malnutrition, and it's for

18   all of these reasons that we're seeking for him to be returned

19   home to live with his parents as a third-party custodian -- as

20   third-party custodians.

21             THE COURT:  Have you filed a medical alert?

22             MS. SHREWSBURY:  I just found out this morning.

23             THE COURT:  Okay.  You will do so?

24             MS. SHREWSBURY:  Yes.

25             THE COURT:  Okay.  Well, Ms. Shrewsbury, was he

```
1    living with his parents --
2              MS. SHREWSBURY:  He was.
3              THE COURT:  -- for the entire six months leading up
4    to this attack?
5              MS. SHREWSBURY:  It is my understanding that he was,
6    Your Honor.
7              THE COURT:  Do you know whether his parents knew he
8    had left and flown to D.C.?
9              MS. SHREWSBURY:  I do not know the answer to that,
10   Your Honor.
11             THE COURT:  Okay.  This was all happening while he's
12   living in that residence; correct?
13             MS. SHREWSBURY:  Yes.
14             THE COURT:  His -- his green book, the -- leaving,
15   buying the one-way flight?
16             MS. SHREWSBURY:  As far as I understood, yes.
17             THE COURT:  Okay.  Do you have anything -- and I
18   understand the position you're in at this early stage of the
19   case.  You may not have all the discovery, but do you have any
20   reason to contest the statements that he made about his
21   intentions to harm the President of the United States?
22             MS. SHREWSBURY:  I don't have any evidence of -- on
23   my own to -- at this moment, no.
24             THE COURT:  To contest that?
25             MS. SHREWSBURY:  No, Your Honor.
```

1          THE COURT:  Okay.  All right.  Thank you.

2          MS. SHREWSBURY:  Thank you.

3          THE COURT:  Mr. Schneider.

4          MR. SCHNEIDER:  Your Honor, unfortunately, we are

5  unable to access the network, and we would request either that

6  I could proffer the video or if the Court would indulge a brief

7  recess for us to bring the video up online.  It may take about

8  15 minutes, Your Honor.

9          THE COURT:  Well, I was planning to take a recess

10  anyway, but just -- just a moment.  I may have a follow-up

11  question for you.

12          One of the arguments that's been made -- and I do have

13  one follow-up question for you too, Ms. Shrewsbury.

14          One of the arguments that has been made,

15  Mr. Schneider -- you're familiar with *United States v. Munchel*?

16          MR. SCHNEIDER:  Your Honor, I'm sorry.  I -- I am

17  not.

18          THE COURT:  Okay.  It's a seminal D.C. Circuit case

19  about the Bail Reform Act, sir.  So why don't you read that

20  case during the break, and I'll ask you my question after that

21  point.

22          MR. SCHNEIDER:  Yes, Your Honor.

23          THE COURT:  Quite surprised about that.

24          Okay.  Ms. Shrewsbury.

25          MS. SHREWSBURY:  (Unintelligible).

1          THE COURT:  I do.

2     Okay.  Thank you.

3     Okay.  Ms. Shrewsbury, do you contest that the

4  rebuttable presumption applies in this case?  I just want -- as

5  a threshold matter, I wanted to make sure that that was the

6  case.

7          MS. SHREWSBURY:  No, Your Honor.  I think that you're

8  correct; that it just has to be something listed in (b).  That

9  (a) is irrelevant.  And they have not moved forward on the

10  crime of violence so we didn't brief that.

11          THE COURT:  Okay.  And then do you have any comment

12  one way or the other about the relationship between the

13  terrorism statute and these proceedings, other than

14  Mr. Schneider's representation that there may be enhanced

15  penalties?  But with respect to the Bail Reform Act and what

16  I'm to consider, I didn't necessarily see a relationship beyond

17  that.

18          MS. SHREWSBURY:  I think that that's correct.

19     Generally, we dispute that the enhancement will apply,

20  but that's something to be addressed at a much later date.

21          THE COURT:  Okay.  In the -- in the *Bilyard*, *Nix*,

22  and *DeCarlo* cases that you cited to me, were those cases in

23  which the government -- where there were detention hearings, or

24  were those cases in which the government did not seek

25  detention?

1      MS. SHREWSBURY:  So it is my understanding from

2  the -- in looking at the dockets, that at least in the first

3  two -- I don't recall exactly the third one, but they did not

4  seek detention.

5      THE COURT:  Okay.  So it's a little bit of a

6  different situation than this case in which there was actually

7  a contested detention hearing?

8      MS. SHREWSBURY:  That's true, Your Honor.  Although

9  the position would be that in circumstances where they're

10  charging the same offense, plus a bunch of additional offenses,

11  and then they don't seek detention, that it -- you know, it

12  merits consideration.  That was the position that we were

13  making.

14      THE COURT:  I don't expect you to know this off the

15  top of your head, but I will ask you:  *Bilyard*, *Nix*, and

16  *DeCarlo*, those defendants, do you know when they were arrested

17  relative to January 6th, 2021?

18      MS. SHREWSBURY:  So I can make some prediction based

19  off their numbers.  They look like they're -- *DeCarlo* is an

20  early 21 number; so it would have been early in 2021.  *Nix* is

21  also a 2021 case, but it's later.  So I can't really predict

22  when -- how many cases there were that year.  And then *Bilyard*

23  is a 2022 case.

24      THE COURT:  Okay.  All right.  Okay.  Do you have a

25  position on whether this particular conduct qualifies as a

1    crime of violence under the statute?

2            MS. SHREWSBURY:  I did not brief that because they

3    weren't raising it as their reason for detention.  So I

4    haven't -- I would argue that it doesn't, but I don't have any

5    support for that at the moment.

6            THE COURT:  Okay.  All right.  Well, I'm going to

7    have questions about *United States v. Munchel* when I get back.

8    You're familiar with the case?

9            MS. SHREWSBURY:  Yes, Your Honor.

10           THE COURT:  Okay.  So I will have questions for both

11   of you-all -- both of you about this case in the context of

12   what the D.C. Circuit has told us about *Munchel*.  And I would

13   like to see the video.  So I'll take a 15-minute break, and

14   I'll be right back.

15           (Recess taken from 2:28 p.m. to 2:56 p.m.)

16           THE COURT:  Okay.  Have you had an opportunity,

17   Mr. Schneider, to read *United States v. Munchel*, the

18   D.C. Circuit opinion?

19           MR. SCHNEIDER:  Yes, Your Honor, I'm now familiar

20   with it.

21           THE COURT:  Okay.  So the D.C. Circuit has made it

22   clear that with respect to the Bail Reform Act, a person -- the

23   Court has to consider forward-looking conduct.  What are the

24   things -- the motive, the means a person might have moving

25   forward to, you know, consider whether or not to detain

1      someone.

2          *Munchel*, of course, was in the January 6th context, and

3      the -- the D.C. Circuit was giving the court -- the District

4      Court guidance as to how to evaluate -- you know, with- --

5      within the confines of the Bail Reform Act, how to evaluate

6      certain conduct in deciding whether or not to detain

7      individuals pretrial.

8          So Ms. Shrewsbury has made an argument that under

9      *Munchel* there is no forward-looking or forward, you know,

10     opportunity or conduct that Mr. Kandula poses a threat of

11     danger.  I just want a response, please, to that, to the extent

12     you can say -- if you need to reference anything that's under

13     seal, you can just reference that.  But I needed to get a sense

14     of what the government's view was on that.  So thank you.

15             MR. SCHNEIDER:  Yes, Your Honor.  Thank you.

16         I apologize for not having that case ready to go.

17         Your Honor, first, in *Munchel*, the Court -- the circuit

18     court talked about the absence of evidence of the destruction

19     of property.  So I'm going to, first, distinguish *Munchel* from

20     the present case.

21         So in that case, *Munchel* and his mother entered the

22     Capitol Building for about 12 minutes.  He had a TASER that he

23     did not use.  The individuals turned themselves in, and there

24     was no evidence of extensive planning, and no evidence of to

25     extremist organizations.

1          So in this case, Your Honor, we -- we do have the intent

2     and evidence of the destruction of property.  Where *in Munchel*

3     they talked about the specific circumstance of January 6th

4     triggering the -- the attempt to interfere with the

5     certification of the election, in this case there's no

6     precipitating event.  There's no -- there was nothing about the

7     evening of May 22nd, May 23rd when this attack occurred that

8     couldn't be August 5th or September 5th or anything else.

9     There's nothing particular about what was happening at the

10    White House that caused the defendant in this case, in the

11    present case, to carry out the attack.

12         They talk about the absence of extremist ties, but here

13    we have clear linkage to extremist ties.  So -- readily

14    displayed by displaying the flag with the swastika on it and

15    immediately after exiting the -- the truck.

16         And in that case, in *Munchel*, the weapon that the person

17    carried was not used.  But in this case the government alleges

18    that his weapon of choice was the large U-Haul.  So,

19    Your Honor, I think the Court could distinguish *Munchel* just

20    based on the facts of this case.

21         And the fact that he has this intent, this -- and this

22    fueled intent to remove democracy, establish this dictatorship

23    indicates that he would -- he will act on that again.  There's

24    nothing -- that hasn't been deterred; wherein the January 6th

25    case, the election was certified.  There was no opportunity for

1    that to be -- to continue.

2          Subject to the Court's questions.

3          THE COURT:  So what -- what you're saying is the

4    January 6th event is not necessarily one that would be --

5    something that would ordinarily be repeated or the

6    certification of the election is not something that, you know,

7    would cause another group of people to necessarily -- that's

8    not a repeatable event, hopefully, but certainly not one that

9    could happen over and over again in the near future?  Is that

10   what you're saying?

11         MR. SCHNEIDER:  Yes, Your Honor.  Also, the sealed --

12   the sealed information indicates that there -- there is an

13   intent to carry out other acts of violence.

14         THE COURT:  Okay.  And is that the forward-looking

15   conduct that the government's relying on to show that this

16   satisfies the *Munchel* test?

17         MR. SCHNEIDER:  Yes, Your Honor.

18         THE COURT:  Okay.  All right.  Thank you.

19   Ms. Shrewsbury, would you like to respond to that?

20         MS. SHREWSBURY:  Sure.  Just briefly, Your Honor.

21         First, we would argue that the allegations made by the

22   government of beliefs or political thoughts are not extremist

23   ties.  There's no allegations of groups or membership that --

24   similar to the individuals in *Munchel*; that there's no

25   allegations in this case of that.

1          It's just -- so far the allegations appear to be, you

2     know, related to potential thoughts or ideas that Mr. Kandula

3     had, but not any sort of ties to other extremists groups or any

4     groups of any kind.

5          We would agree that Mr. Kandula, unlike the individuals

6     in *Munchel*, has no means.  In *Munchel* they found weapons and

7     things in their homes.  There aren't any weapons or firearms or

8     anything present in Mr. Kandula's parents' home where we

9     propose that he goes to live.

10         We would also dispute that the sealed material is

11    necessarily forward-looking.  We don't know -- there's no

12    information provided as to when those -- any statements were

13    written and, you know, what that really meant.

14              THE COURT:  Okay.  Thank you for your argument.

15         And with respect to the medical alert, you are going to

16    make sure that we get that information; correct?

17              MS. SHREWSBURY:  Yes.

18              THE COURT:  Okay.  All right.  Mr. Kandula was in the

19    hospital this morning?

20              MS. SHREWSBURY:  No.  I've learned it was on Monday,

21    but I didn't --

22              THE COURT:  Okay.

23              MS. SHREWSBURY:  -- know that until today.

24              THE COURT:  Okay.  But he's been discharged and --

25              MS. SHREWSBURY:  Yes.

```
1              THE COURT:  -- is doing better?
2              MS. SHREWSBURY:  Yes, Your Honor.
3              THE COURT:  Okay.  All right.
4         Mr. Kandula, with respect to any health issues, I will
5    make sure that whatever health issues are raised, the Court
6    will look into and do what it can to make sure that those
7    issues are brought to the attention of any facility that you're
8    in.  Okay?
9              THE DEFENDANT:  (Unintelligible.)
10             THE COURT:  All right.  Okay.  Do we have the video?
11             MR. SCHNEIDER:  Yes, Your Honor.  And defense
12   counsel's reviewed it.  Should we just approach with the
13   laptop, maybe with a member of the defense?
14             THE COURT:  Yes, please.
15        And I just need to see the portion -- I don't -- you
16   know, the -- with the -- with the vehicle turning.  And we'll
17   put this into the record.
18             MR. SCHNEIDER:  Yes, Your Honor.
19             THE COURT:  Okay.  Okay.  You've seen it?  All right.
20             (A video recording was played.)
21             THE COURT:  Okay.  Thank you.  Thank you.
22        Okay.  Thank you.
23        I have reviewed that portion of the video, which we will
24   put into the record.  I appreciate the government getting that
25   to me.
```

1          MR. SCHNEIDER:  Yes, Your Honor.  We'll provide

2     Government Exhibit 1 to the Court.

3          THE COURT:  Okay.  Ms. Schuck, do you have any

4     position separate and apart from the government's position?

5          THE PRETRIAL SERVICES OFFICER:  Good afternoon,

6     Your Honor.  Christine Schuck, pretrial services.

7          Pretrial services' recommendation remains as stated in

8     the pretrial services report; that there are no combination of

9     conditions that will assure the safety of the community or the

10    defendant's appearance in court.

11         Thank you.

12         THE COURT:  All right.  Thank you, Ms. Schuck.

13         Okay.  Anything further?

14         I'm going to take a brief -- I'm going to take a brief

15    recess and come back to deliver my ruling.

16         MR. SCHNEIDER:  Nothing further, Your Honor.  Thank

17    you.

18         (Recess taken from 3:05 p.m. to 3:23 p.m.)

19         THE COURT:  Counsel, can I see you at the bench,

20    please.

21         (Bench conference on the record.)

22         (REPORTER'S NOTE:  The court reporter could not hear

23    clearly or distinctly any audio on the FTR during the bench

24    conference.)

25         THE COURT:  (Unintelligible).

1    MR. SCHNEIDER:  (Unintelligible) don't know

2    (unintelligible).

3              THE COURT:  Okay.  (Unintelligible).

4              MR. SCHNEIDER:  (Unintelligible).

5              THE COURT:  Okay.  (Unintelligible).

6              (Proceedings held in open court.)

7              THE COURT:  Okay.  I have had a chance to consider

8    the arguments of counsel.  And as you-all know, I have reviewed

9    the papers, and I also reviewed the authority that the parties

10   relied upon, and reviewed the video of the event that -- or at

11   least a portion of the video of the event on May 22nd, 2023,

12   that was shown to me at the bench.  And I will ask that

13   government counsel put that portion of the video onto the

14   record after this hearing is over.

15        I'm going to give a summary of my ruling, but I will

16   follow this up with a written order.

17        The government moves for detention under 18 United

18   States Code § 3142(e) -- (e)(3)(C) as an offense listed in

19   18 U.S.C. 2332b(5)(B) [sic] for which a maximum term of

20   imprisonment, ten years or more, is prescribed.

21        In this case, Mr. Kandula is charged with

22   18 United States Code 1361, which is depredation of property of

23   the United States where the damage exceeds $1,000.  This

24   offense is listed in 18 U.S.C. -- referenced in

25   18 U.S.C. 2332b(g)(5)(B) for which a maximum term of

1      imprisonment of ten years or more is prescribed.

2            The government has also moved for detention under

3      18 U.S.C. 3142(f)(1)(A) as a crime of violence; and

4      18 U.S.C. 3142(f)(2)(A), that defendant poses a serious risk of

5      flight.

6            Mr. Kandula does not dispute that a rebuttable

7      presumption applies in this case under 18 U.S.C. 3142(e)(3)(C)

8      through its cross-reference of 18 U.S.C. 2332b(5)(B) [sic] that

9      lists 18 U.S.C. 1361 as an offense which triggers the

10     presumption.

11           I'm going to be focusing on the request to detain

12     Mr. Kandula under 3142(e)(3)(C).

13           Under the Bail Reform Act, the presumption is that an

14     individual should be released pending trial unless the Court

15     finds that no condition or combination of conditions will

16     reasonably assure the appearance of the person as required and

17     the safety of any other person in the community.  This is the

18     Bail Reform Act.  It's also *United States v. Salerno*,

19     481 U.S. 739 (1987), Supreme Court case.

20           There is a rebuttable presumption in this case, as I

21     mentioned, and that rebuttable presumption is that there are no

22     combination of conditions which would reasonably -- which would

23     assure the safety of any other person in the -- in the

24     community.  And regardless of whether the presumption applies,

25     however, the government's ultimate burden is to prove that no

1   conditions or combination of conditions of release can assure

2   that the defendant will appear and will assure the safety of

3   the community.

4        The government must establish by a preponderance of the

5   evidence that Mr. Kandula poses a serious risk of flight.

6   That's *United States v. Munchel*, 991 F.3d 1273, D.C. Circuit,

7   (2021).  The government must establish, though, by clear and

8   convincing evidence that Mr. Kandula poses a danger to the

9   community and that no combination of conditions or conditions

10  can be fashioned to mitigate that danger.  That's *United States*

11  *v. Xulam*, 84 F.3d 441, D.C. Circuit (1996).

12       Now, Mr. Kandula, I know this is a lot of legal

13  argument, legal -- legal elements and cases.  But, basically,

14  in this context I have to consider four factors and weigh four

15  factors.  This is what Congress has said I have to do, and this

16  is my job, to weigh the facts against these four factors.

17       So as I go forward and explain my ruling to you, I just

18  want you to understand that this is in the Bail Reform Act and

19  these are the four factors that I have to consider in balance

20  when coming to a decision.

21       I have considered the factors laid out in 3142(g).  That

22  is, the nature and circumstances of the offense charged; the

23  weight of the evidence against the person; number three, the

24  history and characteristics of Mr. Kandula; and number four,

25  the nature and seriousness of the danger to any person or to

1    the community that would be posed were I to release

2    Mr. Kandula.

3         In examining those four factors, as well as the

4    rebuttable presumption that applies in this case, I find that

5    the government has met its burden that Mr. Kandula poses a

6    danger to the community that cannot be mitigated through any

7    condition or combination of conditions, and I will grant the

8    government's motion on that basis.

9         I find that the government has failed to meet its burden

10   that Mr. Kandula poses a serious risk of flight, and I am not

11   reaching the request or the prong to consider detention under a

12   crime of violence given that I am -- granted the government's

13   motion under the paradigm that I noted earlier about the

14   cross-reference of 18 U.S.C. 2332b(5)(B) [sic] into the Bail

15   Reform Act.

16        All right.  With respect to the nature and

17   circumstances, the alleged underlying offense is very serious.

18   And this is a serious case, and it weighs strongly in favor of

19   detention.  By way of proffer, the government alleges that on

20   May 22nd, 2023, Mr. Kandula bought a one-way ticket, flew from

21   St. Louis, Missouri, to Dulles airport and immediately went to

22   seek out a U-Haul rental -- rental dealership.

23        He rented a U-Haul and drove to Lafayette park, directly

24   adjacent to the White House.  As I mentioned, I have watched

25   the video of the incident.  Once there, Mr. Kandula used his

1    vehicle to attempt to gain entry into the White House by

2    ramming into the barriers or the bollards on the perimeter of

3    the park outside the White House.  After the initial attempt

4    failed, Mr. Kandula backed up and smashed back into the

5    barriers a second time.

6        In watching the video, I find that when Mr. Kandula was

7    driving eastbound on H Street, Northwest, there does not seem

8    to be very much regard, if any, for the fact that there were

9    multiple pedestrians on the sidewalk.  When he took a right

10   directly into the bollards, there were two people standing very

11   close to the U-Haul that could very well have been struck,

12   potentially fatally or that -- that could have been struck

13   causing serious bodily harm.

14       There were other pedestrians further away from the

15   truck that fled, but the two individuals very close to the

16   sidewalk were very -- were on the sidewalk, close to the

17   truck, were very close to the truck, and it does not appear

18   that Mr. Kandula slowed down or stopped given that they were

19   there.

20       After Mr. Kandula crashed into the bollards a second

21   time and the chassis of the truck has -- had, essentially, been

22   damaged, he exited the vehicle and removed a red and white flag

23   with a Nazi -- Nazi swastika from his backpack.  Mr. Kandula

24   was immediately detained by law enforcement.  And at the scene,

25   among other things, Mr. Kandula indicated that he was trying to

1      get into the White House to, quote, seize power and be put in

2      charge of the nation.  Mr. Kandula told officers that he would,

3      quote, kill the President if that's what I have to do, and

4      would hurt anyone that would stand in the way.

5            Officers recovered a book, which has been referred to in

6      this proceeding as the green book, containing Mr. Kandula's

7      writings, which included a purported speech that Mr. Kandula

8      would allegedly have given, according to him, once he had

9      seized power of the nation.  He, Mr. Kandula, told the officers

10     that his book -- he wanted his book to be -- get out there.  In

11     other words, that the message be disseminated -- at least that

12     is how the Court interpreted it -- and that the book appears to

13     have reflected -- appears to reflect his views and his

14     thoughts, as well as his intentions.

15           Mr. Kandula also noted that in his view the history of

16     the Nazi party is a great one and that he admires Hitler,

17     Adolf Hitler, because he was a strong leader.

18           As I've noted, Mr. Kandula has every right in this

19     country to hold certain views and to identify with certain

20     groups and to say -- make statements that are consistent with

21     his views and his beliefs.  It is, however, when he crosses the

22     threshold as he did in this case, to cause damage or harm or

23     pose threats, where the First Amendment no longer protects him

24     in certain circumstances.

25           As noted by the government, this was a deliberate plan

1     with a calculated terroristic intent, or it appears to be at

2     this stage of the proceedings based on the proffer that I have.

3     It appears that Mr. Kandula admitted to have been planning this

4     act for approximately six months.  The government notes and

5     defendant does not seem to contest that this is a -- an offense

6     which is serious, as it carries a maximum term of imprisonment

7     of up to ten years.

8            With respect to Prong 2, the weight of the evidence, the

9     weight of the evidence in this case is exceedingly strong and

10    also weighs in favor of detention.  As the government noted,

11    the evidence is overwhelming.  If the video that I saw is, in

12    fact, an authentic video and that that is Mr. Kandula in the

13    video, I -- I do note that the evidence appears to be quite

14    strong.

15           It also reflects a reckless disregard for the safety of

16    the individuals on the street that he almost hit, especially

17    the two that I noted that were very close to the U-Haul, let

18    alone the disregard shown to the government property and any

19    potential individuals, including any member of the

20    Executive Branch or Executive Office that could have been

21    harmed or protective staff that could have been harmed had

22    Mr. Kandula been more successful.

23           With respect to the history and characteristics of

24    Mr. Kandula, this factor does not weigh as strongly in favor of

25    detention.  I note that Mr. Kandula has no prior convictions

1    and does not appear to have any sort of prior criminal conduct

2    or record which would reflect that he has engaged in criminal

3    conduct before.

4         I will note and agree that he has no ties to the

5    community and no residence in D.C.  However, he is a lawful

6    permanent resident, and I will just note with respect to

7    the government's argument that Mr. Kandula poses a serious

8    risk of flight, the Court finds that the government has

9    not met that burden because the facts here that the

10   government has presented, in my view, do not meet the legal

11   standard of satisfying that burden.  Simply because Mr. Kandula

12   is a lawful permanent resident of the United States and is

13   facing serious charges without more does not meet that prong

14   that he poses a serious risk of flight simply because he can

15   travel.

16        In my view, there's -- it would be difficult to place a

17   limiting principle on that if those were the only facts that

18   would -- that would meet that standard under the Bail Reform

19   Act.

20        However, I will say that I've relied very, very strongly

21   on history and characteristics and also on the next prong of

22   dangerousness to the community, two facts which were submitted

23   to me or a proffer which was made to me under seal, which I

24   will not be reading in open court, but which were so strong

25   that they in and of themselves could have been dispositive in

1    favor of detention.  I will discuss those facts in a sealed

2    addendum to the order -- written order that I'll ultimately

3    issue.

4         With respect to the fourth prong, dangerousness to the

5    community, again, I rely very, very heavily on those facts

6    which were proffered to me in the sealed portion of these

7    proceedings as to why the Court has found that there are no

8    conditions or combination of conditions which would mitigate

9    dangerousness to the community.

10        It also -- the facts that were proffered to me during

11   the sealed portion of the proceeding is also reason which I

12   cannot accept the proposed third-party custodian plan.  And I

13   will just acknowledge both -- by Zoom Mr. Kandula's mother is

14   here and that Mr. Kandula's father is here in person.  The

15   Court appreciates that your -- that your parents are here to

16   support you, Mr. Kandula.  You're lucky to have parents who

17   will come this far to travel to support you in this type of

18   circumstance and who would stand by you in this circumstance.

19   And I do want to acknowledge that fact.

20        However, there are very serious reasons why I cannot

21   place Mr. Kandula into the custodianship of those two proposed

22   primary and backup custodians, which, again, I will discuss in

23   the sealed portion of my written order.

24        I will also note with respect to the dangerousness to

25   the community, some of the facts that we talked about on the

1    first prong, nature of the offense, that over the course --

2    that Mr. Kandula planned this attack over the course of

3    six months and that he purchased a one-way ticket, which I

4    found to be notable, to travel across the country.

5         He had many opportunities along the way to reflect on

6    the plan and potentially abandon the plan.  Instead, he went

7    through with the plan as far as he could get, and the Court

8    does not know what the ultimate end point of that alleged plan

9    might have been, but certainly it's sufficient to meet the --

10   the prong -- the fourth prong under the Bail Reform Act that

11   there are no conditions which would mitigate the dangerousness

12   to the community or to any individual were I to release

13   Mr. Kandula even on strict conditions.

14        I will also just note that there was an argument that

15   under -- argument that defense made under United States

16   Munchel -- *United States v. Munchel* that there is no

17   forward-looking conduct in this case that the D.C. Circuit

18   requires in order to -- in order to consider whether to hold

19   someone pretrial.  I disagree and find that there are facts

20   which have been proffered to me which reflect forward-looking

21   intentions, forward-looking plans or views that give the Court

22   serious concern about releasing Mr. Kandula.  And so this case

23   is not like those January 6th cases, as serious -- as serious

24   as those were, in which those individuals were released

25   pretrial.

1          Again, I will just note, Mr. Kandula, we will get your

2     medical alert and see to it that you get any medical attention

3     or -- or at least do everything I can to make sure that you get

4     any medical attention that you need.

5          That's my ruling.  Is there anything else further at

6     this time?

7               MR. SCHNEIDER:  Your Honor, the parties have

8     discussed the scheduling of a preliminary hearing in this case.

9               THE COURT:  Okay.

10              MR. SCHNEIDER:  We request July 14th.  And we would

11    move that the time be excluded under the Speedy Trial Act until

12    the preliminary hearing.

13              THE COURT:  Okay.  Just a moment.

14              (Off the record.)

15              MR. SCHNEIDER:  Your Honor, I misspoke.  The week of

16    July 14th, not on July 14th.

17              THE COURT:  Okay.  Well, Ms. Shrewsbury, do you have

18    a date that works for you?

19              MS. SHREWSBURY:  The 13th would be better.  I have a

20    couple of hearings on the 14th.

21              THE COURT:  Okay.  Well, we will -- Ms. Butler, is

22    there time on that day?

23              THE COURTROOM DEPUTY:  (Unintelligible).

24              THE COURT:  Okay.  How about 2 o'clock?

25              MS. SHREWSBURY:  That's fine for the defense,

```
 1    Your Honor.
 2              MR. SCHNEIDER:  Yes, Your Honor.
 3              THE COURT:  Okay.  And I believe that will be before
 4    the duty magistrate judge.
 5         Okay.  And do you have any objection to the tolling of
 6    the time, Ms. Shrewsbury, under the Speedy Trial Act?
 7              MS. SHREWSBURY:  No, we do not, Your Honor.
 8              THE COURT:  Okay.  In light of the fact that the
 9    defendant does not object and in the interests of justice, I do
10    find that the time under the Speedy Trial Act is tolled between
11    now and the next hearing date.
12              Is there anything further?
13              MR. SCHNEIDER:  No, Your Honor.
14              MS. SHREWSBURY:  No, Your Honor.
15              THE COURT:  Okay.  I do remand Mr. Kandula to the
16    custody of the United States Marshals.  And, Mr. Kandula,
17    you'll be back here for your preliminary hearing in July.  And
18    I -- as I said, we'll look into the medical alert.
19              Thank you, all.
20              (Proceedings were concluded at 3:44 p.m.)
21
22
23
24
25
```

1                              CERTIFICATE

2                  I do hereby certify that the foregoing is a true,

3       correct, and complete transcript of the audio-recorded

4       proceedings in this matter, audio recorded on June 9, 2023, and

5       transcribed from the audio recording to the best of my ability,

6       and that said transcript has been compared with the audio

7       recording.

8                  Dated this 18th day of July, 2023.

9

10                              /s/ Nancy J. Meyer
                                Nancy J. Meyer, Official Court Reporter
11                              Registered Diplomate Reporter
                                Certified Realtime Reporter
12                              333 Constitution Avenue Northwest
                                Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25