UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Case No. 23-CR-00222-DLF |
| SAI VARSHITH KANDULA, : | |
| : | |
| Defendant. : | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

Based on Defendant Sai Varshith Kandula's stated aim to overthrow the democratically elected government of the United States, the aim to replace it with a dictatorship fueled by Nazi ideology, and his brazen attempt to gain access to the White House by crashing a large vehicle into the barriers protecting the White House, the government requests this Court sentence him to 96 months (eight years) of imprisonment, followed by three years of supervised release. As a downward variance to the guideline sentence of ten years, the government contends this sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing and to provide adequate deterrence against future criminal conduct.

### FACTUAL AND PROCEDURAL BACKGROUND

Mr. Kandula is before this Court having pled guilty to one count of Depredation Against Property of the United States, in violation of 18 U.S.C. § 1361. He was arrested immediately after the commission of this offense on May 22, 2023 and has been in continuous custody since then. The defendant pled guilty on May 13, 2024, pursuant to a plea agreement.

On Monday May 22, 2023, at approximately 9:35 p.m., a United States Park Police (USPP) officer was patrolling in a stationary police vehicle near H Street, Northwest between 16th Street and Jackson Place, Northwest and observed an orange and white in color U-Haul box

truck (the "U-Haul") traveling eastbound on H Street.  The operator of the U-Haul, later identified as the defendant, turned onto the H Street walking entrance to Lafayette Square, close to 16th Street.  In doing so, the defendant drove onto the sidewalk, sending multiple pedestrians running from the scene in apparent fear.  The USPP officer observed the U-Haul strike the metal bollard barriers that prevent vehicles from entering Lafayette Square, north of the White House grounds.  As the U-Haul initially turned towards the metal bollard barriers, the truck almost hit two individuals who were standing next to a park bench as depicted in **Figures 1**, **2** and **3**.  **Figure 4** depicts the U-Haul after the first impact.



*Figure 1, showing the U-Haul prior to the turn and the pedestrians.*



*Figure 2, showing the pedestrians as the U-Haul drives onto the sidewalk.*



*Figure 3, showing the pedestrians almost being struck by the U-Haul.*

3



*Figure 4, showing the first impact.*

After striking the barriers, the U-Haul backed-up in reverse, and then lurched forward, striking the metal barriers a second time.



*Figure 5, showing the moment before the second impact.*



*Figure 6, showing the second impact.*

The second impact shook the chassis of the U-Haul. At the same time, multiple pedestrians fled the scene by running away from the U-Haul in apparent fear. The second impact disabled the U-Haul, which began smoking from the engine compartment and leaking fluids. The defendant exited the driver's side of the vehicle, went to the back of the U-Haul, and removed a red and white flag with a Nazi Swastika in the center from a black backpack he was carrying. The defendant was quickly detained on scene by law enforcement.[1]

---

[1] A video exhibit of the attack is enclosed as "Government Exhibit 1."



*Figure 7, showing the defendant exiting the U-Haul immediately after disabling his vehicle.*



*Figure 8, showing the defendant exiting the U-Haul with his Nazi Flag.*



*Figure 9, showing the defendant with his Nazi Flag once he was ordered down by the USPP officer.*

While detained, the defendant indicated that he was trying to get to the White House. The defendant was arrested and transported to a USPP station. No weapons or ammunition were found on him. Later that evening, specialized law enforcement units responded and determined no explosives were present in the U-Haul.

The defendant stated that his actions at the White House had been successful because his intention was to send a message to "us." When asked what the defendant meant by "us", the defendant stated that a message was meant to be sent to all organizations like the Secret Service. The defendant added, "either way, whether I got into the White House or not, my message was received." The defendant was asked if he knew how dangerous his actions were, and he stated that he knew he would be arrested, but his "book" would get to those who needed to see it.

The defendant described possessing a "green book" which contains his thoughts in writing. The defendant stated he eventually started writing about his plans to enter the White

7

House, and what he would accomplish if he was in charge. When asked about the flag he showed on the scene, the defendant stated it was a swastika. The defendant stated he purchased the flag online, because in his words, "Nazis have a great history." The defendant was asked to elaborate on what he favors about the Nazis to which he stated that he admires their authoritarian nature, eugenics, and their world order. When asked if he looked up to any leaders, the defendant answered: "Hitler, because he was a strong leader."

The recovered "green book" contained entries about harming family members and other individuals. In addition, the book contained the following passage, which appears to be a planned speech for the defendant after he had seized power:

> My fellow citizens of United States, ~~and res~~ I shall like to start of this broadcast by saying that this moment of history what has come up at this time during this takeover of this nation by our movement, this movement will not only extend within our nation but to the rest of the world as you will see pretty soon. As I am familiar with the [unknown] of this country being a democratic nation, and this will no longer be the case. There shall be consequence if civil unrest happens. ~~To make it clear~~ Any opposition will be met with death penalty to make it clear: (kill president) As you have seen, we will declare martial until the situation has been [unknown]. We will rebuild this world, and put a new system in place once the objective has been achieved. Sieg hail.

Defendant Kandula had been planning the attack for several weeks. Prior to renting the U-Haul and crashing it on May 22, 2023, he made several attempts to gain access to vehicles or armed security guards. For example, on April 22, 2023, Defendant Kandula requested 25 armed guards and an armored convoy from a security company located in Virginia. On May 4, 2023, Defendant Kandula attempted to contact several other companies besides U-Haul in an attempt to rent a large commercial tractor-trailer truck, a dump truck, or another large truck. Mr. Kandula was unsuccessful in arraigning for security guards or a tractor-trailer truck or dump truck. Defendant Kandula attempted to arrange for the services of these security guards and the use of

large vehicles in order to carry out his offense against the U.S. Government. *See* ECF No. 37 at page 2-3 (Statement of Offense 5/13/24).

Defendant Kandula flew on a commercial flight from St. Louis, Missouri to Washington D.C. in the afternoon of May 22, 2023, connecting through another airport on a one-way airline ticket. Defendant Kandula arrived at Dulles International Airport at approximately 5:20 p.m., rented the U-Haul truck at 6:30 p.m., stopped for food and gas, and drove to Washington, D.C., crashing into the barriers protecting the White House and President's Park at 9:35 p.m. *Id*. at 3.

Defendant Kandula's actions caused $4,322 in damage to the National Park Service. This amount included costs for repairing the metal bollard barriers to their original condition and ensuring structural soundness, oil and chemical removal, spill cleanup, and disposal of fluids from the crashed U-Haul. The damaged property was property of the National Park Service, an agency of the United States federal government, within the U.S. Department of the Interior. *Id.* at 2.

As of the date of this filing, the defendant's sentencing is set for September 23, 2024.

### DISCUSSION AND RECOMMENDATION

**I.     Generally Applicable Legal Principles**

Though the Sentencing Guidelines are advisory, *United States v. Booker* provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that the Guidelines provide "the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 590 U.S. 38, 49 (2007); *see also United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("*Booker* has not changed how the Guidelines range is to be calculated."). Moreover, the Guidelines' recommended sentencing range will

ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007); *Dorcely*, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness").

To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. *United States v. Flores*, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry must include an evaluation of all relevant conduct that could affect the Guidelines calculation. As noted:

> In the post-*Booker* world, the court must calculate and consider the applicable Guidelines range but is not bound by it. Under the Guidelines, "the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." *Witte v. United States*, 515 U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3 details the conduct the sentencing court may consider in determining the applicable Guidelines range and the commentary to that section states, "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, Commentary, Background

II. **Defendant's Sentencing Guidelines Calculation**

A. **Defendant's Criminal History Category**

The government concurs with the United States Probation Offices' assessment of the defendant's criminal history scores, as set forth in the Draft Presentence Investigation Report ("PSR"). ECF No. 38 at page 13. The defendant, who is currently 20 years old, and who was 19 years old at the time of the offense, has no criminal history. The total criminal history score is 0 placing the defendant in criminal history category I. *Id.* However, because the offense involved

a federal crime of terrorism, the criminal history category under the Sentencing Guidelines is VI. U.S.S.G. § 3A1.4(b). *Id.*

### B. Total Offense Level

The government also concurs with the United States Probation Offices' assessment of the Offense Level Computation set forth in the PSR. *Id.* at page 11. Based upon the language of the plea agreement, the parties appear in agreement with the calculated guideline range.

With respect to Count 1, Depredation Against Property of the United States, 18 U.S.C. § 1361, the guideline is found in U.S.S.G. §2B1.11. That section provides that an offense involving property damage or destruction has a base offense level of six. U.S.S.G §2B1.1(a)(2). With respect to the specific offense characteristics, the defendant is responsible for an actual loss amount of $56,727 in damages to the National Park Service and U-Haul. Because the loss amount was more than $40,000 but less than $95,000, six levels are added. U.S.S.G. §2B1.1(b)(1)(D). In addition, because the offense involved the conscious or reckless risk of death or serious bodily injury, in that the defendant drove the vehicle onto the sidewalk, causing pedestrians to flee the area, 2 levels are added. U.S.S.G. §2B1.1(b)(16)(A).

A "federal crime of terrorism" is defined in U.S.S.G. §3A1.4, and 18 U.S.C. § 2332b(g)(5) as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of specific provisions of sections of Title 18 that include § 1361. 18 U.S.C. § 2332b(g)(5). *See also United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012). Because of the defendants expressed motivation for carrying out the offense (his actions were calculated to influence or affect the conduct of government by intimidation or coercion) his conduct is classified as a

11

federal crime of terrorism. As a result, 12 levels are added. Because the resulting offense level is less than level 32, his offense level is increased to level 32. U.S.S.G. §3A1.4(a).

The defendant is not entitled to a Zero-Point Offender adjustment under U.S.S.G. §4C1.1(a) because the enhancement for Terrorism is applied and §4C1.1(a)(2) thus prohibits application of the reduction.

The defendant is entitled for the reduction for Acceptance of Responsibility. The defendant has clearly demonstrated acceptance of responsibility for the offense and has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Therefore, the defendant is entitled to a three-point reduction under U.S.S.G. §3E1.1(a) and (b).

Based upon a total offense level of 29 and a criminal history category of VI, the guideline imprisonment range is 151 months to 188 months. However, the statutorily authorized maximum sentence of 10 years is less than the minimum of the applicable guideline range; therefore, the guideline term of imprisonment is 120 months. U.S.S.G. §5G1.1(a).

### III.     Sentencing Recommendation

When determining the appropriate sentence, the District Court should consider all the applicable factors set forth in 18 U.S.C. § 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). The listed factors in 18 U.S.C. § 3553(a) include: (1) the nature and circumstances of the offense; (2) The history and characteristics of the defendant; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the

defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The government's requested sentence, 96 months (eight years) of imprisonment, followed by three years of supervised release, which represents a downward variance to the guideline sentence of ten years, is a sentence sufficient, but not greater than necessary, to achieve the goals of sentencing and to provide adequate deterrence against future criminal conduct.

As discussed in detail below, there are three troubling aspects in this case which justify a meaningful term of imprisonment. First, is the defendant's determination to carry out his plans. Second, is what the plans themselves entailed. Third, to date, the government is unaware of any evidence that the defendant has abandoned his plans, acknowledged his misguidedness, or repudiated the aims. While he entered a guilty plea and provided a statement of offense that described his conduct, the government is unaware of any evidence that he has abandoned the original aim to overthrow the government.

First, with respect to the defendant's determination, it is notable that he took several actions showing advance planning and deliberation. His April 22, 2023, request for 25 armed guards and an armored convoy from a security company located in Virginia shows he had been planning for the attack for at least a month – knew the target was near Washington, D.C. and knew or intended for violence, hence the request for "armed guards." The investigation also uncovered evidence of his intent on May 4, 2023, to use an even larger vehicle for his plans - a large commercial tractor-trailer truck, a dump truck, or another large truck. While he was unsuccessful in renting anything larger than a U-Haul, his intent was clear – he needed a big truck, because he had a big plan.

The planning into this offense highlights the need for specific deterrence and for a high

13

sentence to protect the public from the defendant. At the time of the offense, he held very clear and specific aims he wanted to accomplish. Further, the length of time involved in the planning shows not only his determination, but also many opportunities for him to reflect upon his plan and abandon it. Notably, the flight records of the defendant traveling from Missouri to Washington, D.C., where he was on a connecting flight, must have provided a time for reflection, and for him to call off his attack. Instead, Defendant Kandula decided to carry out his attack and booked a one-way ticket.

Second, the defendant's plan was as dangerous as they come. In sum, he wanted to attack and destroy the elected Government of the United States. The plan to execute this was to carry out an attack on the White House, acknowledging that the President would be killed in the process. He wanted to eliminate the democratic process in America and replace the government with a Nazi style dictatorship. He specifically praised Adolf Hitler. And it wasn't just words – when his truck was disabled in the attack, the first thing he did was unfurl the flag of Nazi Germany. It is hard to imagine a more destructive plan, or a more destructive intent than Defendant Kandula harbored on May 22, 2023: his goal was the total upheaval of the United States.

While one could look at his attack and claim its unsophisticated methods were unlikely to penetrate the security measures the Secret Service has in place, recent events involving the attempted assassination of former President Trump simply serves to remind that individuals who carry such destructive intent are capable of inflicting serious damage to the American political system.[2] Even young individuals who may, at first glance, seem to lack the resources to

---

[2] See *The Assassination Attempt Against Donald Trump*, N.Y. Times, July 14, 2024, available at: https://www.nytimes.com/2024/07/14/briefing/donald-trump-assassination-attempt.html (last accessed September 6, 2024).

successfully carry out a high-profile attack on American democracy, may succeed, despite the many layers of security the U.S. Government employs to protect government officials. *Id.* Regardless of security measures in place, his actions were only stopped because of those measures, not because the defendant chose at any point to abandon or withdrawal from his plans. Because he was stopped at an early point in the long sequence of destruction he intended, does not mitigate the criminal intent he harbored. His conduct also highlights the need for general deterrence, to ensure that anyone who is considering committing an act of terrorism against the U.S. Government knows that they will be held to account.

Third, while the First Amendment provides broad protection for individuals to hold various political beliefs, including the beliefs the defendant held, when those political beliefs are coupled with plans and acts of violence directed against the integrity of the U.S. Government, it amounts to terrorism. Certain offenses committed in a way that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," meet the statutory definition of terrorism. Terrorism is especially heinous crime. At its core, terrorism is an act that causes more than the direct harm at the point of impact or action, it creates secondary harm by inspiring fear and creating panic, which in turn is a separate harm. The government is unaware of any evidence that the defendant has renounced the motivation that led to this attack, justifying the need to protect the public trough a 96-month sentence. Nevertheless, the government concedes that the factors in this case involving the defendant's personal characteristics, also justify a downward variance to 96 months as a sentence not greater than necessary to achieve the sentencing objectives. *See* ECF No. 38 at page 15 and 18 U.S.C. § 3553(a)(1).

In addition to the sentence requested, the government requests the Court order restitution

to U-Haul International, Inc. in the amount of $52,405.00 and to the U.S. Department of Treasury in the amount of $4,322.00.

## CONCLUSION

For all these reasons, the government recommends that the Court sentence the defendant to 96 months of incarceration to be followed by three years of supervised release.

                                Respectfully submitted,

                                MATTHEW M. GRAVES
                                United States Attorney

By:    */s/ Alexander R. Schneider*
       Alexander R. Schneider
       Michigan Bar No. P71467
       Special Assistant United States Attorney
       601 D Street, N.W.
       Washington, D.C. 20530
       alexander.schneider@usdoj.gov
       (202) 252-7124