**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 23-CR-00222 (DLF)** |
| | : | |
| **SAI VARSHITH KANDULA,** | : | |
| | : | |
| **Defendant.** | : | |

**SENTENCING MEMORANDUM**

**The Evening of May 22, 2022[1]**

Sai steps from behind the U-Haul truck. He's wearing a t-shirt and shorts and looks as thin as the traffic pole in the foreground. He has a flag in his right hand and a black bag in his left. The flag is red, white, and black, and you can make out the swastika in the middle if you slow down the footage. He has no time to unfurl it. He lays it on the ground, along with the black bag, raises his hands over his head, and lies prostrate on the sidewalk. Two officers approach and grab his wrists. They pull his arms behind his back. Sai yelps. He says, "please, please don't hurt me." An officer asks if he has any weapons. He says, "no."

Moments earlier, Sai drove the truck into the protective posts that separate the White House grounds from the sidewalk. He struck them twice and almost hit two bystanders before the truck came to a halt. It doesn't appear he meant to hit the bystanders. It's not even clear he saw them. It's dark out, they're dressed in dark clothes, and they stood on the edge of the corner where Sai turned in on his approach to the barriers.

---

[1] The events described below come from a law enforcement bodycam and fixed video surveillance. The bodycam and video will be manually filed with the court on a single flash drive and labelled as exhibits 1 (bodycam) and 2 (fixed video surveillance), respectively.  The events described in the first paragraph come from the bodycam and appear within the first 6 minutes of the footage. The events described in the second paragraph come from the fixed video surveillance and appear within the first two minutes.

Once in custody, an officer removed Sai from the scene. She sat him down across the street. "So you tried to run into the White House?" she asked. "Yep," he said, "I'm gonna be the new leader of this country."

### The morning of May 22, 2022[2]

12 hours earlier, at about 7:00 a.m., Sai left his home in St. Louis. He told his parents he'd signed up for a construction course. He'd take an Uber and return in a few hours. Instead, he took the Uber to the airport and hopped a flight to Virginia via New Jersey.

Sai didn't stray from home often, and his parents grew worried about two hours later. They sent him a series of texts and called several times. He didn't respond or answer. At around 2:00 p.m., his father checked an app he uses to track Sai's credit card. The app showed a purchase at the airport in Newark. His parents called the airport's main line. The airport had no information. Neither did the airline. They turned for advice to an aunt and cousin in New Jersey. Sai's parents thought they should call the police. The relatives told them to wait 24 hours. Sai was 19, an adult. What could the police do? A flurry of calls to family in Texas, California, and India ensued before Sai's parents reconciled themselves to the 24-hour wait. They slept in fits and starts that night for about four hours all told.

Come morning, Sai's parents walked out the front door. They planned to file a report with the police. A neighbor approached as they neared their car and mentioned a news report he'd seen the night before. In shock, Sai's parents moved back inside and talked with their neighbor. A team of FBI agents arrived within an hour or less. Interviews and searches followed. Sai's father called his cousin in New Jersey after the agents left and booked a flight to Newark. He flew out the next morning. His wife stayed behind with their younger son.

---

[2] The facts below come from discussions with Sai's parents and their May 22 texts to Sai.

In Newark, Sai's father called the public defender in D.C. The person on the other end gave him the number of the jail where Sai was housed. Sai's father and his cousin made the four-hour trek from Newark to D.C. Sai and his father met by video for about five minutes. Over the screen, Sai said little. He didn't want to talk. Sai's father and his cousin drove back to Newark and to DC again the next day for another visit. It went no differently than the first. Sai's father returned to St. Louis that night.

### Why?[3]

According to law enforcement, Sai's crash into the White House barriers was the "culmination of a six-month plan to 'seize power' from the government." But it was less a "plan" than an assemblage of delusional thoughts stitched together by a common thread.

For about six months, phantasmic ideas whirled in Sai's head. He jotted them down in a notebook…an archive of his impairment. According to Sai, a reptilian race had installed a puppet regime to operate the U.S. The regime's policies, along with like-government policies worldwide, had brought on a catalog of human miseries—some ordinary, some otherwise: war, overpopulation, poverty, space alien-induced race mixing, public corruption, environmental degradation, censorship, reduced space-tech research, gender disorder, transhumanism, urban sprawl, inflation, natural disasters, and over-farming to name just a few.

In Sai's mind, only a global suzerain could eliminate these tribulations through programs and policies mundane and fantastic, from largescale data collection and worldwide urban planning to depopulation of undesirables, inter-stellar consciousness transfer, and the development of synthetic human beings. Sai would usher in this global transformation as the

---

[3] The facts below come from Sai's notebook and interviews with law enforcement authorities.

overlord of a newly installed dictatorship and consolidate power within two to three years. The takeover would begin in the U.S. with the death of the president if necessary.

To catalyze this vision, Sai purchased a one-way ticket to D.C. on May 22, 2023, and rented a U-Haul truck to drive into the White House. He had no weapons, assistance, or plan to implement once he reached the White House grounds. He didn't need one. He thought he'd successfully communicated his message to the relevant authorities—the reptilians or their underling puppets—when he stepped from the truck with the flag. He expected them to relinquish authority in short order, hence the future tense response to the officer who questioned him: "I'm gonna be the new leader of this country."

### Sai's Family[4]

More ordinary family experiences lay in the past. Sai's parents met in 2002, two months before their arranged marriage. Sai's father, Lakshman, was 26. Madhavi, his mother, was 24. Their families come from Hyderabad, in south central India, where they still live. Lakshman's parents live close by his brother, his brother's wife, and their 14-year-old daughter. Madhavi's parents live near a collection of her aunts and uncles. Her only sibling, a twin sister, lives in California with her two sons, age 16 and 20.

Lakshman and Madhavi live much like their parents'. Madhavi wears a sari and cooks homemade Indian meals. She has a college degree but never entered the workforce. Her life centers on the couple's children. Lakshman has a civil engineering degree but turned to construction when he could find no work in the field. He later retrained in software development where he's worked since 2000. He's the family's sole income earner. Among themselves and with their children and friends, they speak Telugu, their native language, and they regularly

---

[4] The facts below come from discussion with Sai's parents, Sai's high school transcript, his medical records, and the reports of Elisha Agee, Psy.D., and Avram Mack, M.D.

attend the local Hindu temple. They are shy, soft spoken, unassuming, and uneasy with discussion about family matters.

Sai arrived two years after his parents married. Three years later, Lakshman's employer offered him a position in Atlanta. Lakshman moved, found an apartment, and Madhavi and Sai joined him three months later. Four years on, Sai's younger brother came along, and the family returned to Hyderabad to raise their new son near family.



Lakshman switched jobs a year later, and the family returned to the U.S. when the opportunity arose again in 2015. They lived in Memphis for four years, then relocated to St. Louis. Sai was 14 and about to start high school. His brother was 10.

According to his parents, Sai enjoyed the outdoors and books but grew withdrawn when high school began. He had few friends and wanted to dropout at the end of the first semester. His

parents had other thoughts. They encouraged him to continue through graduation, and Madhavi helped him with homework.

Sai spent most of his time alone or with his brother. They watched TV, played chess and video games.



Emotionally, Sai struggled. Academically, he floundered. In his freshman year, he earned mostly Ds and Cs with A-grades in fitness and sports.

His grades didn't improve in his second year, and, as the year progressed, he complained of chest pain and anxiety. The family met with a doctor who suggested counseling and medication. She detected no trouble with Sai's heart but noted his "fidgety" and "anxious" appearance, along with "poor eye contact" and self-reported unease at school. Despite the recommendation, Sai never met with a counselor or psychiatrist.

In his third year, Sai's grades picked up. He earned mostly Bs with one D and one C, but he still wanted to leave school. That summer, he suffered two or three episodes of vertigo and visual hallucinations, flashes of light and "floaters" he would see in the dark. Medical records reflect a doctor visit but no recommended treatment.

Sai graduated five months later, in January 2022, with a 2.857 GPA.



After graduation, Sai held jobs at a motel and two fast-food outfits, Wendy's and McDonald's. The jobs lasted one to two weeks or less. According to Sai, he didn't have the stamina the jobs required. In May, the family travelled home to Hyderabad for five weeks. According to his parents, Sai didn't interact with relatives as he had in the past, and he seemed more withdrawn than usual. When the family returned home in July, he enrolled full-time at a local college, where he participated in online and in-person classes and took to his room more often.

By December, more dramatic changes emerged. Sai grew sensitive to light. He stayed in his room—the lights off, the shades drawn. He left home only for walks and school. His appearance grew disheveled, he ate little and lost weight. He let his hair grow out, didn't shower, and wore the same clothes on most days. He spent less time with his brother. His parents urged him to see a doctor and arguments followed when he declined



Between February and May, Sai's parents protested his sporadic school attendance, unkempt appearance, and sullen disposition. Sai would respond in one or two words or not at all and go back to his room. His parents attributed his decline to depression and urged him to get help. Sai resisted. His parents didn't know where to turn, and they had no familiarity with the very few options available to families with adult children in crisis, temporary or permanent guardianship or involuntary commitment.



Following Sai's detention, a licensed clinical psychologist at the University of Virginia School of Medicine diagnosed him with schizophrenia. A D.C. area M.D. rendered the same diagnosis five months later. The M.D is board certified in psychiatry, forensic psychiatry, and child and adolescent psychiatry and is a member of the American Board of Psychiatry and Neurology. Neither expert fixed a date of onset. But both suspect the first symptoms came on during Sai's early to middle high school years. Both also believe his illness led directly to his offense.

Schizophrenia comes in varying forms and those diagnosed with the disorder describe different subjective experiences. No two schizophrenic experiences are the same, though every diagnosis must conform to common psychiatric criteria. There is no cure for schizophrenia, either. But it's treatable with medication and therapy. Treatment, however, is a lifelong endeavor.

Shortly after May 22, White House grounds keepers restored the balustrades Sai struck. And U-Haul presumably repaired or replaced its damaged truck months ago.





The damage done by mental illness to Sai and his family will take much longer to repair, and the family will never restore him to his pre-illness state. A lifetime of rehabilitation, medication, and therapy lies ahead of them. His parents, though, are committed to his treatment, he and has made gains already. His hygiene and grooming have improved. He talks weekly with his parents and misses them greatly. He's amenable to treatment, understands its necessity, and recognizes an illness produced the acts that led to his current circumstances.

Sai and his parents also understand that his conviction will likely result in deportation. If so, Madhavi will return with him to India. They will live with her parents, while Lakshman and Sai's brother remain in the States until his brother settles in at college. Lakshman will then return home. Hyderabad is a city of 7,000,000 with widely available mental healthcare options. The family will turn to them if and when deportation comes.

### The Criminal Justice System and Mental Health

The criminal justice system has long recognized the relationship between mental illness and culpability. Mental health courts represent the latest expression of this recognition. Nationally, mental health courts numbered only four in 1997.[5] By 2022, the number had risen to over 650.[6] These problem-solving courts operate differently across the country, but they share common goals:  to improve public safety by reducing recidivism; to improve the quality of life for the mentally ill; and to reduce court- and corrections-related costs by providing alternatives to incarceration.[7]

California has 40 mental health courts in 27 counties,[8] San Mateo County in Northern California among them.[9] In January 2023, Dharmesh Patel, a Pasadena radiologist, drove his car off the Pacific Coast Highway.[10] The car plunged 250 feet to a rocky outpost below, a few yards

---

[5] *See* Office of Juvenile Justice and Delinquency Prevention, *Mental Health Courts Literature Review, A product of the Model Programs Guide* at 2 (Oct. 2010), available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://ojjdp.ojp.gov/model-programs-guide/literature-reviews/mental_health_courts.pdf.

[6] See  Sam Whitehead, "Well-Intentioned Mental Health Courts Can Struggle to Live Up To Their Goals," National Public Radio (Dec. 27, 2023), available at https://www.npr.org/sections/health-shots/2023/12/21/1219628362/well-intentioned-mental-health-courts-can-struggle-to-live-up-to-their-goals#:~:text=More%20than%20650%20adult%20and,and%20get%20linked%20to%20services.

[7] *See* Council of State Governments Justice Center, *Mental Health Courts: A Guide to Research-Informed Policy And Practice*, Exec. Summary (2009), available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/CSG_MHC_Research.pdf.

[8] *See* California Courts, The Judicial Branch of California, *Juvenile Mental Health Courts Overview*, available at https://www.courts.ca.gov/5990.htm#:~:text=In%20California%2C%20there%20are%20more,11%20juvenile%20mental%20health%20courts.

[9] *See* San Mateo County Pathways Mental Health Court Program, available atchrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.smchealth.org/sites/main/files/pathways_court_presentation-draft_jan_2022__final_edits.pdf.

[10] The Guardian, "California Dad Who Drove Family Off Cliff Sentenced to Mental Health Court Instead of Trial" (June 26, 2024), available at https://www.theguardian.com/us-news/article/2024/jun/26/california-doctor-family-cliff-trial-mental-health-treatment; CBS News, "Doctor Who Drove Family Off Cliff Fuels Legal Debate:  Should Attempted Murder Defendants Get Treatment Instead of Trial" (July 26, 2024), available at

from the Pacific Ocean. His wife and two children, age 4 and 9, were on-board. According to his wife, her husband tried to kill the family. According to local authorities, it was an "absolute miracle" that he didn't.



The San Mateo County District Attorney's Office charged Dr. Patel with three counts of attempted murder. At a contested hearing this past June, the court diverted his case under California's Mental Health Diversion law. Dr. Patel's wife, who suffered spinal injuries in the fall, supported the court's decision, which will see Dr. Patel released on a GPS monitor while he participates in treatment and resides with his parents before the court formally dismisses his case in two years.

---

https://www.cbsnews.com/sacramento/news/devils-slide-plunge-dharmesh-patel-mental-health-diversion-debate-cbs-news-california-investigates/; Amy Larson, KTLA News, "Family of Doctor Who Drove Kids Off Cliff Say He Has Schizoaffective Disorder" (May 11, 2024), available athttps://ktla.com/news/nationworld/family-of-doctor-who-drove-kids-off-california-cliff-say-he-has-schizoaffective-disorder/.

Doctors had alternately diagnosed Dr. Patel with major depressive and schizoaffective disorder. According to the prosecuting attorney and Patel's wife, Patel thought the world was collapsing. He sent his wife articles about the war in Ukraine, the fentanyl epidemic, and child sex trafficking. He heard footsteps at night, carried a knife for three days, and feared his children would fall prey to child predators. According to Dr. Patel's lawyer, his mental illness culminated in a psychotic episode during which he drove the car and his family off the cliff.

The federal criminal justice system has no mental health courts or similar program for the mentally ill. For Sai and those like him, there is simply the statutory offense of conviction, its concomitant range of punishment, and the United States Sentencing Guidelines.

In Sai's case, the statutory offense of conviction carries a 0-10-year range of punishment. The Guidelines would advise a sentence of 10-16 months if they applied as ordinary. But the Guidelines do not apply in Sai's case as they ordinarily do. His feckless endeavor qualifies for an adjustment under the "terrorism" guideline, which produces a rather stark effect: It raises his total offense level from 12 to 29, ups his criminal history category from I to VI, and yields an advisory punishment range of 151-188 months, adjusted downward to the statutory maximum penalty of 120 months for increases of 110 and 104 months to the low- and high-end of his otherwise applicable range.

Unsurprisingly, the terrorism guideline's remarkable effect has spawned criticism.  To many, the guideline's automatic offense level and criminal history category spikes "take[] a wrecking ball to th[e] [Guidelines'] carefully constructed edifice."[11] They undermine individualized sentencing, treat dissimilar individuals similarly, dispense with proportionate

---

[11] *United States v. Alhaggagi*, 372 F.Supp.3d 1005, 1013 (N.D. Cal. 2019) (*rev'd* on other grounds) (*citing* George D. Brown, *Punishing Terrorist: Congress, the Sentencing Commission, the Guidelines*, and the Courts, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014)).

sentencing, and produce sentences at or above the statutory maximum for all to whom the

guideline applies, regardless of the great differences among them.[12] What's more, the guideline

achieves these unwelcome ends in the absence of empirical evidence to support its mandated

increases.[13] The guideline, these critics note, did not result from the United States Sentencing

Commission's empirical approach to guideline development.[14] It resulted, instead, from a

congressional directive.[15] Moreover, when the Commission promulgated the guideline, the

terrorism case sample size was insubstantial.[16] As a result, the Commission had no statistically

reliable group of defendants it could analyze to construct a reliable guideline to apply in future

cases.[17] In other words, the base offense level and criminal history category jumps the guideline

demands result from speculation, not data. In Sai's case, the congressional record underlying the

Antiterrorism and Effective Death Penalty Act of 1986, which gave rise to the terrorism

guideline in its current form, also casts doubt on the wisdom of the guideline as applied to

individuals like him.[18] Section 730 of the Act contains the directive to the Commission to render

the guideline applicable to all federal terrorism offenses.[19] But the congressional record does not

---

[12] *See id; see also United States v. Dais*, 482 F.Supp.3d 800, 802-803 (E.D. Wisc. 2020); *United States v. Stewart*, 590 F.3d 93,153-154 (2nd Cir. 2009) (Calabresi, J. concurring).

[13] *See Alhaggagi*, 372 F.Supp.3d at 1014 (*citing United States v. Jumaev*, No. 12-cr-00033-JLK, slip op., 2018 WL 3490886, at 10*, *id.* n. 15 (D. Colo. July 18, 2018)),

[14] *See id.*

[15] U.S.S.G., amend. 539 (Nov. 1, 1996).

[16] *See Alhaggagi*, 372 F.Supp.3d at 1014 (*citing* James P. McLoughlin Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Inequity 51, 112, 115 (2010).

[17] *See id.*

[18] *See* the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1303; *see also* U.S.S.G., amend 539.

[19] *See id.*

suggest Congress contemplated individuals like Sai when it passed the Act or issued the directive.[20] The record references individuals of a qualitatively different kind: Timothy McVeigh, Sheikh Omar Abdel-Rahman, and the like,[21] not impaired 19-year-olds who vainly act to realize fantastic delusions animated by mental illness.

Critics also contrast the terrorism guideline with another congressionally directed Guidelines provision, the career offender guideline, which likewise mandates offense level and criminal history category increases.[22] As the critics point out, these two guidelines work quite differently. The career offender guidelines' automatic increases apply "precisely because [a defendant] has a certain criminal history,"[23] namely, two qualifying predicate crimes of violence or controlled substance offenses.[24]  The terrorism guidelines' increases apply without thought to past convictions.[25] Consequently, "[t]he terror enhancement's criminal history adjustment [often seems] simply a way of 'cooking the books' to get to a score and a desired sentencing range."[26]

 Of course, Guidelines calculations are advice. And courts need not follow them when countervailing considerations suggest they miss the mark. For example, the nature and circumstances of the offense, the history and characteristics of the defendant, and the traditional

---

[20] See Pub. L. 104-132, 110 Stat. 1303 (cong. rec.), available on Westlaw.

[21] See id.

[22] See Alhaggagi, 372 F.Supp.3d at 1015-1016 (citing Jumaev 2018 WL 3490886, at *11 and United States v. Mehanna, No. 09-10017-AO (D. Mass. 2012) (Transcript of Disposition dkt 439) at 69)).

[23] See id. at 1016 (citing. Mehanna, No. 09-10017-AO (Transcript of Disposition dkt 439) at 69)).

[24] See U.S.S.G. §4B1.1.

[25] See U.S.S.G. §3A1.4.

[26] See Alhaggagi, 372 F.Supp.3d at 1016 (citing United States v. Mehanna, No. 09-10017-AO (Transcript of Disposition (dkt 439) at 70).

purposes of sentencing—retribution, deterrence, incapacitation, and rehabilitation[27]—may reveal the unsuitability of the advice in a given case.[28] Courts may adopt "different sentencing philosophies," too, and, in their discretion, they may "emphasize and weigh" these various considerations differently; "every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."[29]

In Sai's case, competing considerations seemingly weigh in favor of a sentence that substantially varies from the Guidelines advice. He is 20 years old. He was 19 at the time of the offense and has no prior law enforcement contacts, arrests, or convictions.[30] He also has the support of well-adjusted, caring parents, who are committed to his mental health improvement, as is Sai himself and his extended family who will assist Sai and his parents with his treatment if he's deported. In addition, Sai's offense caused physical harm to no one and had no real possibility of success. It has, however, caused significant emotional distress to his family, which they will grapple with for years to come.

The purposes of sentencing seem to weigh against the Guideline's advice, as well. For instance, the Guidelines' recommended retributive response of 120 months appears grossly inappropriate in Sai's case. "The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender."[31] Yet schizophrenia

---

[27] *See Tapia v. United States*, 564 U.S. 319, 325 (2011) ("These four considerations—retribution, deterrence, incapacitation, and rehabilitation—are the four purposes of sentencing generally, and a court must fashion a sentence 'to achieve the[se] purposes…to the extent they are applicable' in a given case.").

[28] *See* 18 U.S.C. § 3553(a).

[29] *United States v. Gardellini*, 545 F.23d 1089, 1093 (D.C. Cir. 2008).

[30] *See Alhaggagi*, 372 F.Supp.3d at 1017 (departing downward from criminal history category VI to I for a zero-point offender subject to the terrorism guideline).

[31] *See Graham v. Florida*, 560 U.S. 48, 71 (2010).

induced his offense, not a deeply held ideological bent on which he lucidly acted. The psychiatrically disordered origin of his conduct substantially diminishes Sai's culpability.[32] His age does too. At 19, Sai was (and at 20 he remains) an "emerging adult," with a brain neurologically, anatomically, and developmentally distinct from a mature adult in ways highly relevant to a reasoned assessment of his culpability. Like juveniles, "emerging adults" show reduced impulse control, engage in greater risk-taking for rewards, display a heightened susceptibility to influence, and demonstrate a greater capacity for change.[33]

---

[32] *See generally Atkins v. Virginia*, 560 U.S. 304 (2002) (discussing the relationship between mental capacity and culpability and noting "[t]he severity of the appropriate punishment necessarily depends on the culpability of the offender.")

[33] The most recent and perhaps thorough exposition of the reduced culpability of emerging adults comes from the Massachusetts Supreme Court in a lengthy opinion issued earlier this year. Among other things, the court wrote,

> Advancements in scientific research have confirmed what many know well through experience:  the brains of emerging adults are not fully mature. Specifically, the scientific record strongly supports the contention that emerging adults have the same core neurological characteristics as juveniles have. As the Superior Court judge noted, 'Today, neuroscientists and behavioral psychologists know significantly more about the structure and function of the brains of [eighteen] through [twenty-year olds] than they did [twenty] years ago . . . .' This is the result of years of targeted research and greater access to relatively new and sophisticated brain imaging techniques, such as structural magnetic resonance imaging (sMRI) and functional magnetic resonance imaging (fMRI). From the detailed evidence produced in the record, the judge made four core findings of fact regarding the science of emerging adult brains:  emerging adults (1)  have a lack of impulse control similar to sixteen and seventeen year olds in emotionally arousing situations, (2) are more prone to risk taking in pursuit of rewards than those under eighteen years and those over twenty-one years, (3) are more susceptible to peer influence than individuals over twenty-one years, and (4) have a greater capacity for change than older individuals due to the plasticity of their brains. The driving forces behind these behavioral differences are the anatomical and physiological differences between the brains of emerging and older adults. These structural and functional differences make emerging adults, like juveniles, 'particularly vulnerable to risk-taking that can lead to poor outcomes.'"

*Commonwealth v. Sheldon Mattis*, 493 Mass. 216, 225; 224 N.E.3d 410, 420-421 (2024) (brackets in the original) (citations omitted).

Emphasis on rehabilitation through treatment will also more likely reduce the possibility of re-offense than will incapacitation for eight years or more. Sai is not prone to criminality. Indeed, he has no criminality in his past that predates his mental illness. Moreover, his illness is treatable, he is amenable to treatment, and he has no interest in repeating his offense or committing future acts of criminality. He simply wants to return to his former self.

As to general deterrence, no evidence compiled over the more than 30-years of Guidelines sentencing suggests long-term incarceration will produce a greater general deterrent effect than will a shorter period of incarceration. In fact, just the opposite.[34]

Sai's case is obviously unusual. It's not typical terrorist fair, and a sentence consistent with the Guidelines' advice calculated without the terrorism adjustment seems the most appropriate under the facts and circumstances of his case. Formally, his offense meets the requirements for application of the terrorism guideline. But in substance, he's no terrorist. He's a 20-year-old with a serious but treatable mental illness, and a sentence of 10-16 months time-

---

[34] *See e.g.*, Department of Justice, National Institute of Justice, Five Things About Deterrence (2016) ("The certainty of being caught is a vastly more powerful deterrent than punishment"); Kelli D. Tomlinson, *An Examination of Deterrence Theory: Where do We Stand?*, 8-Dec. Fed. Probation 33 (2016) (concluding "non-legal factors, such as marriage, employment, peers, morality, disapproval from loved ones, ostracism, and shame, hav[e] more impact on conformity than do sanctions and threats"); *see also* Cheryl Marie Webster and Anthony N. Doob, *Searching for Sasquatch: Deterrence of Crime through Sentence Severity*, The Oxford Handbook of Sentencing and Corrections, p. 174-175, Oxford University Press (2012) ("Despite enormous research efforts, no credible consistent body of evidence has been found to support the conclusion that harsher sentences (within ranges conceivable in Western democracies) achieve marginal deterrent effects on crime."); Anthony N. Doob, Cheryl Marie Webster and Rosemary Gartner, *Issues Related to Harsh Sentences and Mandatory Minimum Sentences:  General Deterrence and Incapacitation,* at A-3, University of Toronto, Centre for Criminology & Social Studies, (2014) ("At this point, we think it fair to say that we know of no reputable criminologist who has looked carefully at the overall body of research literature on 'deterrence through sentencing' who believes that crime rates will be reduced, through deterrence, by raising the severity of sentences handed down in criminal courts."); Valerie Wright, Ph.D., Research Analyst, The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment* at 9 (2010) ("Existing evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive."); Michael Tonry, *Learning from the Limitations of Deterrence Research*, Chicago Journals, Crime and Justice, Vol. 37, No. 1, University of Chicago Press (2008), pp 301-302 ("It is unclear to me which is more surprising: that so little credible evidence exists that criminal behavior is much affected by changes in punishment policies or that policy makers continue to believe that policy changes significantly affect behavior and that research continues to test for their crime-preventive effects.").

served with GPS monitoring, mandated treatment and therapy, and a requirement to reside with

his parents will satisfy that which the law requires:  a sentence sufficient but not greater than

necessary to comply with the purposes of sentencing.


                                        Respectfully submitted,

                                        */s/ Scott Rosenblum*
                                        SCOTT ROSENBLUM
                                        Counsel for Defendant
                                        Missouri Bar No. #33390
                                        120 S. Central Ave., #130
                                        Clayton, MO  63105
                                        (314) 862-4332
                                        srosenblum@rsfjlaw.com




                          **CERTIFICATE OF SERVICE**

        I certify that on September 9, 2024, this document was electronically filed with the Clerk
of the Court to be served by operation of the Court's electronic filing system upon Mr.
Alexander Schneider, Assistant United States Attorney.




              .




                                        19